FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

OCT 16 2013

D. MARK JONES, CLERK
BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | REPORT AND RECOMMENDATIONS |
| Plaintiff, | CASE NO. 2:12-CR-00644-TS |
| v. | |
| JUAN JUAREZ-MORENO, | Magistrate Judge Robert T. Braithwaite |
| Defendant. | |

Before the Court is a Motion to Suppress Evidence submitted by defendant Juan Juarez-Moreno. (Docket Entry No. 21) After thorough review and consideration of the evidence and testimony presented at the evidentiary hearing and the parties' pleadings, the Court recommends that defendant's Motion to Suppress Evidence be **DENIED.**

## FACTUAL BACKGROUND

Trooper Bronson Wood has been employed by the Utah Highway Patrol ("UHP") for seven years. (Transcript of 5/21/2013 Evidentiary Hearing at 4.) As a

1

member of UHP's K-9 criminal interdiction team, Trooper Wood makes a large number of traffic stops to intercept wanted persons, stolen vehicles, impaired drivers, and drug traffickers. (<u>Id.</u> at 4-5.) During his career, Trooper Wood has made over 7,000 traffic stops, more than two dozen of which resulted in "pipeline stops," or seizures of significant quantities of illegal drugs. (<u>Id.</u> at 5, 9.)

On September 23, 2012, Trooper Wood patrolled Interstate 70, east of Richfield, Utah. (<u>Id.</u> at 5,6.) Around 1:00 am, he stopped an eastbound car for failure to dim headlights when passing westbound traffic. (<u>Id.</u> at 6-7.) Trooper Wood made contact with the male driver and his female passenger. (<u>Id.</u> at 8.)

As the trooper approached the vehicle, he observed luggage on the back seat instead of in the trunk and a single key in the ignition. (<u>Id.</u> at 8.) Trooper Wood approached the passenger side of the car and explained the reason for the stop. (Id at 11.) The female passenger, who spoke English, stated that the driver spoke only Spanish and she relayed to the driver the reason for the stop. (<u>Id.</u> at 11-12.) Trooper Wood saw the passenger gesture to the bright light indicator on the dash, and the driver then turned off his high-beam headlamps. (<u>Id.</u> at 12.)

Trooper Wood identified the driver by his Mexican passport as Juan Juarez-Moreno. (<u>Id.</u> at 13.) The passenger stated that Mr. Juarez did not have a driver's license. (<u>Id.</u> at 13-14.) Trooper Wood then asked for the registration and proof of

insurance. (Id. at 14.) The passenger removed the registration from the glove compartment, but seemed confused about what she was looking for and continued to search the glove compartment. (Id.) The trooper asked who owned the car, and the passenger--after pausing and looking at the registration paperwork--said "Stephanie." (Id.) The passenger then claimed that "Stephanie" was her friend. (Id.)

The trooper discovered that the vehicle's registration was merely an incomplete application filed just two days earlier. (Id. at 14-15.) The vehicle was insured under yet another person's name. (Id. at 15-16.) Neither the registered owner nor the insured party were present in the car. (Id. at 16.) Trooper Wood considered these facts significant, as he frequently sees vehicles in pipeline stops that have recently been registered to third-parties as traffickers attempt to distance themselves from ownership of a car and the drugs it contains. (Id. at 16-17.) A recently registered vehicle might also indicate that the car was purchased merely for the purpose of transporting drugs. (Id. at 16.)

Trooper Wood invited Mr. Juarez back to his patrol vehicle to obtain more information and complete a citation. (Id. at 17, 37.) Trooper Wood called UHP Sergeant Banks, who was fluent in Spanish, to act as interpreter by telephone. (Id.) Sergeant James Banks, an eight-year veteran and supervisor with UHP, testified he began learning Spanish in 1999, that he speaks it fluently, and that he speaks Spanish

practically every day. (Id. at 56-57.) Sergeant Banks recalled assisting Trooper Woods communicate with Mr. Juarez. (Id. at 57-58.) Sergeant Banks testified that he and the defendant had no difficulty communicating with one another and that on one or two occasions Sergeant Banks asked defendant to repeat or verify something he said to confirm that he heard him correctly. (Id. at 58-59.)

Through Sergeant Banks, Trooper Wood asked Mr. Juarez about basic personal information such as address and date of birth. (Id. at 18.) Trooper Wood also asked about the passenger, about who owned the vehicle, and about Mr. Juarez's basic travel plans. (Id.) Mr. Juarez stated that he had been dating the passenger for two years and that they were on their way to visit her aunt in Colorado. (Id. at 18-19.) Mr. Juarez said he did not know his girlfriend's family, only that her mother lived in Arizona. (Id.) He also claimed he was only driving because his girlfriend was tired. (Id. at 19.) Sergeant Banks conveyed to Trooper Wood that Mr. Juarez would not directly answer any questions regarding the vehicle or its owner, giving the impression that he wanted to distance himself from the car. (Id. at 18-19.)

Trooper Wood also spoke with the passenger again. (Id. at 20.) She agreed to answer questions and claimed they were traveling to Denver, "possibly" to visit her aunt. (Id.) The passenger was unable to provide either an address or phone number for her aunt and then admitted to Trooper Wood that the purpose of the trip was not

4

to visit her aunt. (Id.) When asked about her relationship to Mr. Juarez, the passenger said they had been dating for two months and that she only knew him by a nickname. (Id. at 21.) She advised that they were traveling from Los Angeles. (Id.)

When asked about travel plans, Mr. Juarez said that he was traveling from Tijuana, where he lived. (Id. at 28, 59.) Dispatch advised Trooper Wood that a records check indicated Mr. Juarez had a prior border crossing in 2010 and was associated with a prior federal cocaine trafficking investigation. (Id. at 28.) Records also showed that the passenger had crossed the border between Mexico and the United States numerous times. (Id. at 27-28.)

Through Sergeant Banks, Trooper Wood obtained verbal consent to search the car from Mr. Juarez. (Id. at 21-22.) Trooper Wood then printed a consent-to-search form—in both English and Spanish—and gave it to the defendant to review. (Id. at 22.) Trooper Wood also obtained written consent to search from the passenger. (Id. at 22-23.) Trooper Wood testified that he observed both subjects sign the consent forms. (Id. at 24; see also Govt. Ex. 1-A and 1-B.)

While obtaining consent, Trooper Wood did not draw his weapon, physically touch the defendant or his passenger, raise his voice, use a commanding or threatening tone, or otherwise coerce Mr. Juarez or his passenger. (Id. at 26-27.)

There was another officer present, but Trooper Wood asked that officer to remain in his own police vehicle until consent was given. (Id. at 26.)

Having obtained consent, officers searched the car. (Id. at 28-29.) Initially officers noted aftermarket wires under the dash that were later found to be associated with an alarm system. (Id. at 29.) Trooper Wood also noticed a screw was missing from the driver's door panel and saw the remaining screws had tool marks, suggesting the door panel had been previously removed. (Id. at 29, 51.) Trooper Wood considered these observations significant because he has previously found contraband inside car door panels. (Id. at 29.)

Trooper Wood retrieved an upholstery tool, removed some of the door panel clips, and looked behind the panel. (Id. at 30.) The panel concealed "two cylinder shaped packages, approximately eight to twelve inches long, wrapped in green cellophane." (Id.) The trooper, having seen illegal drugs packaged similarly in other investigations, arrested Mr. Juarez and his passenger. (Id. at 31.) Upon closer inspection, officers discovered a total of nine packages concealed inside of the vehicle's doors. (Id.) Field testing of the packages showed that they contained approximately nine pounds of methamphetamine, and subsequent laboratory testing found the methamphetamine was nearly one-hundred percent pure. (Id. at 31-32, 71.)

Drug Enforcement Administration ("DEA") Task Force Officer ("TFO") Brian Lacy, with the assistance of Agent Brian Bairett and interpreter Deputy Cody Barton, interviewed Mr. Juarez following his arrest. (Id. at 67-68.) Before the interview began, Deputy Barton advised Mr. Juarez of his Miranda rights in Spanish. (Id. at 68, 69.) Mr. Juarez requested an attorney. (Id. at 69.) TFO Lacy asked no further questions of Mr. Juarez regarding his activities or the drugs. (Id.) TFO Lacy did confirm Mr. Juarez's identity and that he had located the defendant's correct criminal history. (Id.) TFO Lacy also asked Mr. Juarez whether he would consent to a search of his cellular telephone, and Mr. Juarez readily consented. (Id. at 69-70.) TFO Lacy did not ask the defendant about what evidence the phone might contain nor whether he made any calls relating to drug trafficking. (Id. at 70, 73.)

Agent Bairett, a UHP investigator, was present during TFO Lacy's interview of the defendant. (Id. at 77-79.) Following defendant's request for an attorney, Agent Bairett asked Deputy Barton to simply advise Mr. Juarez —without asking any further questions—that his girlfriend would be facing the same criminal charges as Mr. Juarez. (Id. at 79.) After being so advised, the defendant volunteered, "They gave me that car. She had nothing to do with this." (Id. at 80.) Agent Bairett did not continue the interview with additional questions, did not ask the defendant to clarify

his statement, and did not ask whether the defendant had changed his mind and now wished to speak further without an attorney present. (Id. at 71, 80.)

## ANALYSIS

Defendant asserts that the evidence obtained against him should be suppressed because 1) Trooper Wood unlawfully detained the defendant; 2) defendant did not provide valid consent to search his vehicle; and, 3) investigating officers violated defendant's rights under Miranda v. Arizona. Each of these claims will be addressed in turn.

## I. TROOPER WOOD DID NOT UNLAWFULLY DETAIN THE DEFENDANT.

Defendant argues that he was illegally detained because Trooper Wood exceeded the scope of the traffic stop without reasonable suspicion to justify further investigation.[1]

---

[1] Although in his conclusion defendant asserts "[t]hat the officer did not have sufficient grounds to detain defendants [sic]," (def. mem. at 16.), he makes no argument and offers no analysis suggesting the initial traffic stop was improper. Instead, defendant's challenge centers on the claim that his detention became illegal after the purpose of the traffic stop was completed. And, while defendant argues that "officers did not possess any probable cause to detain defendant during the traffic stop," (id. at 7), only reasonable suspicion—not probable cause—is required to detain a motorist. See United States v. Soto, 988 F.2d 1548, 1554-55 (10th Cir. 1993).

The Tenth Circuit has explained,

> Generally a police officer's actions during a detention must be reasonably related in scope to the circumstances which justified the initial stop. An investigative detention usually must last no longer than necessary to effectuate the purpose of the stop. An investigative detention may be expanded beyond its original purpose, however, if during the initial stop the detaining officer acquires "reasonable suspicion," of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity.

United States v. Villa-Chaparro, 115 F.3d 797, 801-02 (10th Cir. 1997)(citations and quotations omitted).

In assessing reasonable suspicion, the Court must base decisions not on any one factor, but on the "totality of the circumstances." United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995). Courts must also defer to trained law enforcement personnel and their "ability to distinguish between innocent and suspicious circumstances." United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997).

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same–and so are law enforcement officers. . . . [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. Trained officers aware of the modes and patterns of operation of certain kinds of lawbreakers can draw inferences and make deductions that might well elude untrained persons.

Id. (citing United States v. Cortez, 449 U.S. 411, 418 (1981)). "The evaluation is made from the perspective of the reasonable officer, not the reasonable person." United States v. Quintana-Garcia, 343 F.3d 1266, 1270 (10th Cir. 2003)(emphasis in original).

The reasonable suspicion standard is not a rigorous one:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

United States v. Tuter, 240 F.3d 1292, 1296 n.2 (10th Cir. 2001)(citing Alabama v. White, 496 U.S. 325, 330 (1990)). Indeed, "[a]s long as [the officer] has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality." United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004)(emphasis in original).

Based on the totality of the circumstances, Trooper Wood had reasonable suspicion that defendant was engaged in criminal activity prior to asking for consent to search the car. These circumstances include at least the following:

1. **Recent Vehicle Registration.** The vehicle registration, which was nothing more than an incomplete application, was submitted just two days prior to the traffic

stop.  See <u>United States v. Espinoza,</u> 2007 WL 1018893 at *4 (D. Kan.)

(unpublished)(finding evidence that a "vehicle was registered to defendant just three

days prior to the traffic stop, which is common for drug organizations seeking to

present the driver as a legitimate owner of the vehicle," contributed to reasonable

suspicion); <u>see also</u> <u>United States v. Berrelleza,</u> 90 Fed.Appx. 361, 364 (10th Cir.

2004) (unpublished)(recently registered vehicle a factor in finding reasonable

suspicion).

    **2.  <u>Third-Party Vehicle Registration.</u>**  The vehicle registration application

was submitted in the name of an individual who was not present in the car.  As the

District Court has explained:

> A vehicle without the presence of its registered owner is termed a third-party
> vehicle by law enforcement officers.  One recurring factor supporting a
> finding of reasonable suspicion . . . is the inability of a defendant to provide
> proof that he is entitled to operate the vehicle he is driving.  A defining
> characteristic of the Tenth Circuit's traffic stop jurisprudence is the
> defendant's lack of a valid registration, license, bill of sale, or some other
> indicia of proof to lawfully operate and possess the vehicle in question, thus
> giving rise to objectively reasonable suspicion that the vehicle may be stolen.
> The fact that the vehicle is not registered in the driver's name, combined with
> other factors, engenders the possibility that a defendant has stolen the vehicle,
> is transporting narcotics, or both.

<u>United States v. Wisniewski</u>, 358 F.2d 1074, 1090 (D. Utah 2005)(citations and

quotations omitted).  The District Court further explained that this factor "clearly

weighs heavily in favor of . . . reasonable suspicion."  (<u>Id</u>.)

**3. Lack of Knowledge of Vehicle Owner.** The defendant was evasive when questioned about vehicle ownership, and the passenger provided the first name of the supposed owner only after pausing to look at the paperwork—despite claiming the car belonged to a friend. See United States v. Sandoval, 7 Fed.Appx. 861, 864-65 (10th Cir. 2001)(unpublished)(determining that the inability to provide name of registered owner of car contributed to reasonable suspicion of illegal activity).

**4. Vague, Inconsistent, or Evasive Answers.** Defendant claimed he and the passenger had been dating for about two years, that they were traveling to see her aunt in Colorado, and that he was traveling from Tijuana. (Tr. at 22-23.) The passenger, however, stated that she and the defendant had been dating for only two months, that she knew him only by a nickname, and that they were traveling from Los Angeles to "possibly" see her aunt. (Id. at 24.) "Confusion about details is often an indication that a story is being fabricated on the spot," United States v. Santos, 403 F.3d 1120, 1131 (10th Cir. 2005), and when considered in conjunction with other articulable facts, contributes to the reasonable suspicion calculus.

**5. Deceptive answers.** When pressed, the passenger could not provide an address or phone number for her aunt and then admitted that they were not really enroute to see her aunt. Deceptive answers, when coupled with other suspicious behaviors, can give rise to reasonable suspicion. See, e.g., United States v. Carhee,

27 F.3d 1493, 1497-98 (10th Cir. 1994); <u>United States v. Moore</u>, 22 F.3d 241, 243 (10th Cir. 1994).

     **5. <u>Other Indicators.</u>** Trooper Wood noted a single key in the ignition, rather than on a key ring with other keys, suggesting the vehicle may have been purchased or used for illegal activity. <u>See</u> <u>United States v. Guerrero</u>, 472 F.3d 784, 788 (10th Cir. 2007)(noting that a lone key in the ignition is a weak factor but supported reasonable suspicion). Trooper Wood also took note of luggage on the rear seat of the car—rather than in the trunk as is generally the case for the motoring public—a circumstance he has observed in other pipeline stops. <u>See</u> <u>United States v. McIntosh</u>, 1995 WL 12023 at *1 (10th Cir. Jan. 12, 1995)(unpublished)(noting irregularities regarding luggage being a factor supporting reasonable suspicion). Trooper Wood has observed these same indicators during other pipeline stops. (Tr. at 8-11.) And, while of limited significance, such indicators nevertheless support a finding of reasonable suspicion to briefly detain the defendant for further investigation.

     The factors listed above combined to give Trooper Wood reasonable suspicion to believe defendant was engaged in illegal activity. Trooper Wood was not required to ignore them, and his "inquiry about drugs accounted for but a moment of defendant's brief detention and was based upon specific and articulable facts and rational inferences." <u>United States v. Espinosa,</u> 782 F.2d 888, 891 (10th Cir. 1986).

## II. DEFENDANT CONSENTED TO THE VEHICLE SEARCH.

It is well settled that the Fourth Amendment prohibits warrantless searches unless they fall within certain exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)(quoting Katz v. United States, 389 U.S. 347, 357 (1967)). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Id. (citing Davis v. United States, 328 U.S. 582, 593-94 (1946)).

The Tenth Circuit analyzes consent issues by examining the totality of the circumstances surrounding the consent, with no presumption concerning the voluntariness or involuntariness of the consent. See, e.g., United States v. Price, 925 F.2d 1268, 1270 (10th Cir. 1991); United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993). The government must establish voluntariness of consent to search by demonstrating that (1) the consent was unequivocal, specific, freely and intelligently given, and (2) that the consent was not the product of duress or coercion. See, e.g., United States v. Orrego-Fernandez, 78 F.3d 1497, 1505 (10th Cir. 1996).

Notably, defendant does not assert that he did not consent or that he withdrew or limited the scope of consent. Instead, he challenges the validity of consent with the

14

conclusory assertion that, because he was illegally detained, "any consent given was defective and did not give rise to a proper and legal search of the vehicle." (Def. Mem. at 15.) In essence, then, the defendant re-packaged his reasonable suspicion argument as a consent argument. As demonstrated in Part I above, however, Trooper Wood had reasonable suspicion to justify detaining defendant to further investigate those suspicions. Moreover, in this brief period, defendant expressly consented–both verbally and in writing–to a search of his vehicle. (Tr. at 21-22; Gov't. Ex. 1-A.)

**A. Defendant gave unequivocal consent to search the vehicle.**

When Trooper Wood asked, through the interpreter, if the defendant was involved in illegal activity, the defendant said he was not. (Tr. at 21.) Trooper Wood then asked for consent to search the vehicle and defendant readily agreed. (Id. at 21-22.) Though Mr. Juarez had already offered verbal consent, Trooper Wood took the cautious step of presenting him with a written Consent to Search form printed in both English and Spanish. (Id. at 22; Gov't. Ex. 1-A.) Trooper Wood provided the form to the defendant, invited him to read it, and observed him sign it. (Id. at 22.) Uncontradicted evidence establishes that Mr. Juarez freely, unequivocally consented to the vehicle search.[2]

---

[2] Defendant does not argue that he failed to understand either the verbal request to search his vehicle or the Consent to Search form. Although defense counsel objected to Government's Exhibit 1-A by claiming that Mr. Juarez did not sign the Consent to Search form (and intimated that Mr. Juarez might take the witness stand to testify accordingly), the defense

**B. Defendant was neither coerced nor under duress when he gave Trooper Wood consent to search.**

Defendant does not argue that coercion or duress vitiated consent; rather, he suggests that, because he was unlawfully detained, his consent was not voluntary. As previously shown, Mr. Juarez was not unlawfully detained at the time Trooper Wood asked to search the car. And, as demonstrated below, defendant was neither coerced nor under duress when he gave Trooper Wood consent to search.

"Merely because a person is detained or in custody does not preclude voluntary consent." United States v. Manuel, 992 F.2d 272, 275 (10th Cir. 1993)(citing Florida v. Royer, 460 U.S. 491, 501 (1983)). Indeed, a valid consent to search may be given by a person who is being detained, United States v. McRae, 81 F.3d 1528 (10th Cir. 1996); United States v. Soto, 988 F.2d 1548 (10th Cir. 1993), and it has been long established that subjects need not know or be told that they may refuse to give consent in order for consent to be valid. Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973).

Under the totality of circumstances, the evidence compels the conclusion that defendant's consent was given voluntarily rather than a product of duress or coercion. See United States v. Orrego-Fernandez, 78 F.3d 1497, 1505 (10th Cir. 1996). While

---

ultimately failed offer contradictory evidence. (Tr. at 25.) Thus, the government's evidence before the Court regarding consent remains uncontested.

Sergeant Banks assisted by interpreting over the telephone, the other officer present

at the scene stayed in his own patrol car when the defendant consented to the search.

(Tr. at 31.)  The evidence before this Court establishes that Mr. Juarez was not

physically harmed or touched; was not threatened; was not spoken to in a threatening

tone or with a raised voice; no weapons were brandished; and the search commenced

on the side of a public roadway.  (Id. at 26-27.); see also Orrego-Fernandez, 78 F.3d

at 1505.  The defendant voluntarily consented to the search in writing—while

lawfully detained and free from coercion or duress.  His claim that consent was

defective is unsupported by the evidence.


## III.   OFFICERS DID NOT VIOLATE DEFENDANT'S MIRANDA RIGHTS.

Without citing any legal authority, defendant merely asserts that officers

violated his rights under Miranda and that all statements, both at the traffic stop and

during his post-arrest interview, as well as all evidence obtained during the search of

his phone, should be suppressed.  (Def. Mem. at 15.)

### A. Trooper Wood was not required to advise defendant of his Miranda rights during the traffic stop.

Miranda "stands for the well-known proposition that a suspect in custody has

a constitutional right under the Fifth Amendment to remain silent."  United States v.

Alexander, 447 F.3d 1290, 1294 (10th Cir. 2006). And, although Miranda provides for certain procedural safeguards regarding custodial interrogation, "two requirements must be met before Miranda is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993).

With respect to the first requirement, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). The United States Supreme Court has stated plainly that "[t]he . . . noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." Berkemer v. McCarty, 468 U.S. 420, 440 (1984)(quotation in original)(emphasis added).

As for the second requirement, "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions . . . reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980)(footnotes eliminated). Nevertheless,

> [I]t is beyond dispute that an officer may ask questions relating to the reason for the stop. Ordinarily, this also includes questions relating to the motorist's travel plans. Travel plans typically are related to the purpose of a traffic stop because the motorist is traveling at the time of the stop. For example, a

18

motorist's travel history and travel plans may help explain, or put into context, why the motorist was weaving (if tired) or speeding (if there was an urgency to the travel).

United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001)(citations omitted).

When Trooper Wood questioned defendant during the course of a routine traffic stop, defendant was not "in custody" and defendant has offered no analysis to establish that he was "interrogated" for purposes of Miranda. Defendant's claim that his rights were violated by questioning during the traffic stop therefore fails.

### B. Defendant's voluntary statement, made after invoking Miranda, was not the product of interrogation and is therefore admissible.

As noted above, "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions . . . reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980)(footnotes eliminated). Although a defendant must "not be subjected to compelling influences, psychological ploys, or direct questioning" after invoking his Miranda rights, voluntary statements are not the product of "interrogation" merely because officers are aware of the "possibility" that a defendant might incriminate himself. See Arizona v. Mauro, 481 U.S. 520, 528-29 (1987). Indeed, "[t]he fact that [the officer's statements to the defendant] may have struck a responsive chord, or even that they may have constituted 'subtle compulsion' is insufficient to find that they were the functional equivalent of interrogation." United States v. Moreno-

Flores, 33 F.3d 1164, 1169-70 (9th Cir. 1994)(citing Innis, 446 U.S. at 303).

After Juarez-Moreno requested an attorney, Agent Bairett asked the interpreter to inform Mr. Juarez that his girlfriend would be booked on the same drug charges he was facing. (Tr. at 79.) Agent Bairett made clear to the interpreter that he did not want any further questions asked of the defendant. (Id.) The defendant volunteered, "They gave me the car. She had nothing to do with this." (Id. at 80.) Following this response, Agent Bairett asked no further questions, did not invite the defendant to clarify or elaborate on his statement, and did not ask defendant if he now wished to speak further without an attorney present. (Id. at 79-80.)

In Shedelbower v. Estelle, 885 F.2d 570 (9th Cir. 1989), the defendant made some statements initially during a post-arrest interview but then requested an attorney. As the officers prepared to leave, one advised Shedelbower that a co-conspirator was in custody and—falsely— that the victim had identified Shedelbower by photograph as one of her rapists. (Id. at 572.) Shedelbower then advised that he wanted to continue the interview. (Id.) Later, after fresh Miranda warnings, he confessed. (Id.) Shedelbower claimed his confession was obtained in violation of Miranda because officers used a "calculated falsehood" to further interrogate him. (Id.)

The Ninth Circuit affirmed the trial court's ruling that Shedelbower's additional statements were admissible. "The officer's statements were not the functional equivalent of questioning. They did not call for nor elicit an incriminating response. They were not the type of comments that would encourage Shedelbower to make some spontaneous incriminating remark." (Id. at 573.) Finding that the officer's remarks "were not an invitation to further discuss the matter," the Court concluded, "it hardly seems reasonable that the police were eliciting a response from Shedelbower; otherwise, they would have stayed and listened to him confess right then." (Id. at 573-74.)

Even less calculated than the officer in Shedelbower, Agent Bairett offered no false information to Mr. Juarez. The agent's statement to the defendant was not a question, did not call for or elicit an incriminating response, and was not an invitation to continue the interview. Indeed, after the defendant gave a voluntary response, officers did not seek to have him clarify the statement, ask additional questions, or otherwise attempt to obtain a confession. Rather than interrogation, Agent Bairett's statement was a matter-of-fact statement about anticipated criminal charges arising from the incident. See Easley v. Frey, 433 F.3d 969, 974 (7th Cir. 2006)(finding statement regarding evidence and possible consequences of charges not interrogation); United States v. Payne, 954 F.2d 199, 202 (4th Cir. 1992)(same);

United States v. Gonzalez-Sanchez, 2008 WL 2783526 at *7 (D. Utah)(same).

Thus, while Agent Bairett's statements "may have struck a responsive chord" or even been considered "subtle compulsion," they did not amount to interrogation. See Moreno-Flores, 33 F.3d at 1169-70. Therefore, defendant's voluntary response to Agent Bairett, made after he had been advised of—and elected to invoke—his rights under Miranda, is admissible.

## C. Requesting consent to search does not implicate the Fifth Amendment.

Defendant makes no claim that consent was refused but, rather, acknowledges that TFO Lacy "requested and received defendant's consent to search his phone" subsequent to defendant's invocation of his Miranda rights. (Def. Mem. at 15.) However, "a consent to search is not the type of incriminating statement which the Fifth Amendment was designed to address." United States v. Rodriguez-Garcia, 983 F.2d 1563, 1568 (10th Cir. 1993). Once an in-custody defendant invokes his right to remain silent, officers may nevertheless request consent to search because "[c]onsenting to a search is not 'evidence of a testimonial or communicative nature' which would require officers to first present a Miranda warning." Id.; see also United States v. Corleto, 2009 WL 274488 at *11 (D. Utah)(upholding consent obtained after defendant invoked Miranda). Thus, defendant's claim that he could not give valid consent after invoking Miranda also fails.

## RECOMMENDATION

Based on the foregoing analysis, **IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Evidence, (file entry 21), be **DENIED.**

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby noticed of their right to object to the same. The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. Section 636(b), within fourteen (14) days after receiving it. Failure to file objections to both factual and legal findings may constitute a waiver of those objections on subsequent appellate review.

DATED this 16th day of October, 2013.

ROBERT T. BRAITHWAITE
United States Magistrate Judge